Close class. Please be seated. Will the court call the roll please? 314-0404, people of the state of Illinois, acted by Garrick and Inouye, versus Tavarius Redford, appellant by Steven Barrow. Mr. Barrow, good morning. Good morning. I'm Steve Barrow with the Office of the State of Colorado Defender for the defendant appellant, Tavarius Redford. May it please the court. In this case, my client was charged with murder and child endangerment in connection with the death of his daughter. The state asked for a jury instruction on a voluntary manslaughter at the close of the evidence. My client was acquitted of murder and a voluntary manslaughter, but convicted of child endangerment. I've raised three issues in this case. First, that my client was not proven guilty beyond reasonable doubt. Second, that there is a jury instruction error as to the mental state that is extremely prejudicial in this case. And third, that there is a violation of his right to a public trial. That third issue was raised in a supplemental brief. And I'd like to focus today on the very serious trial errors that occurred in this case. The first one I'd like to go to is the public trial issue that I raised in my supplemental brief. Now, I understand that Justice Dade, Justice Redford, your honors, and Mr. Knudovic have recently been in a courtroom in which this occurred. The docket sheets indicate this was in courtroom number 300 in Kekow County. I was wondering where you were going with that. Where you were at during the May 5th call. So you're familiar with the courtroom where this occurred. It's Judge Erickson's courtroom. And so in this case, Judge Erickson. We should explain for the record that we were participating in a May Day argument. We were not gathering in a social context. Sure. Absolutely, yes. It was an oral argument call. Yes. And so what Judge Erickson did in this case was he decided, he observed that before he called in the prospective jurors, the courtroom was roughly divided between people who were there in support of my client and people there who were in support of the state. And so he decided that during the voir dire, he was going to limit the number of people who could attend to four people. Two members of the defendant's family and two members of the people of the family supporting the prosecution. It was the same family, essentially. So he limited it to four people. And this was completely unnecessary, is the bottom line here. Did it vary over the course of the trial? I know the courtroom was crowded because of the veneer that was there, but did he close the courtroom during the course of the trial as well? During the trial, there was a period where there were a number of journalism students who were in attendance at that time. And the judge told them, if you can't find a seat, you have to leave the courtroom. If you can't find a seat, you have to leave the courtroom. So find a seat, is what he said. So that may have been a time when the courtroom seating capacity was exceeded because the journalism students were present as possible, that some of those journalism students may have been excluded. So that was during the trial, during the playing of the interrogation video, which was essential to this case. But otherwise. So during the trial, it wasn't two in favor of your client and two in favor of the other side. During the trial, everybody affiliated with both parties came into the courtroom, but the bystanders were not able to find all seats for them? It's correct that the limitation to four people was only during the voir dire. It did not take effect, or the judge did not implement that restriction during trial. And the voir dire is part of trial, is it not? Oh, yeah, I'm sorry. That's language misuse on my part, yes. On my part, I understand. Oh, OK. Certainly, the voir dire is part of trial. It's the same. The standard is the same for exclusion during voir dire and during trial. But the significant thing about the fact that the exclusion order did not apply during the trial is that there were 12 jurors and three alternates there during the whole trial, which means there are 15 people in the jury box and no people. There was no limitation to four people during trial. So it shows that it was completely unnecessary to restrict it to four people during voir dire because the judge could have just called in panels 15 at a time, and the situation would have been exactly the same at trial, where there's no indication of any overcrowding, except this one period involving the journal of students. So there was a very reasonable alternative here. And also, in any event, the judge wanting to bring in a large number of potential jurors is not an overriding interest that overrides the right to a public trial. So this issue is pretty clear-cut. The case of Peele versus Evans is really directly on point here. It's structural. It's second-pronged structural plein air, or sorry, structural air, and therefore, second-pronged plain air. And additionally, I would note that the limitation to just two people from the defendant's family was really completely arbitrary. And this is a large courtroom. I mean, to have just four people from the public there, when you could certainly accommodate more by calling fewer jurors at a time, it's just it was a completely unnecessary closure. The other side that the judge allowed two people to represent was not the state, right? Yeah, two people. I mean, normally, the parties are the state and the defendant. Correct. When he said two people representing the other side of the defendant, he was talking about who? So what he said was two people from the defendant's family and two people from the victim's family was the wording, I guess, of what he decided. And obviously, the defendant was the victim's father. So I mean, there's crisscross between the family members. Did you request the parties to collaborate with him before making that decision? Did the defense counsel participate in that decision? No, no, not at all. The judge did this on its own motion. So he was not asked by the state, and no party asked that he do this. And so this is an issue that this court should reverse the conviction for that reason. This court could also, if it reaches issue two, reverse the conviction for that issue. That's the jury instruction error issue. The jury was instructed with the mental state of willfully in this case. Now, that had been the statutory language in the past. But the Supreme Court had interpreted willfully in that statute to mean knowingly, and the legislature changed the mental state language from willfully to knowingly in 2013 before my client's trial. So certainly, the reason for this was because the legislature recognized that willfully was unclear. And there was no other reason for the amendment, because it didn't change the mental state. The mental state was knowingly before, and it remained knowingly after based on the Supreme Court decision interpreting it that way. Willfully is a term that's been historically recognized as being ambiguous. The United States Supreme Court has said that it's a word of many meanings. And I've cited cases where judges have interpreted it as being strict liability in one case. That's a third case I cited. That judgment was reversed, but the appellate court reversed it and said that it meant recklessness. Willfully is also less than knowingly, which is what was required to be proven here. So the mental state instruction and child endangerment was error here. And it's additionally noteworthy that in this case, there were three jury instructions, an instruction on murder, which included mental state knowledge, an instruction on involuntary manslaughter that the state asked for after a court of evidence that instructed the jury on recklessness, and there was the willfully as a mental state. So the jury was confined with three different mental states. It was only given a definition of recklessness. So it wasn't given a definition of knowledge or willfulness. Was there a request for that instruction? There was not. There was not. This is an issue that I've argued can be addressed under either ineffective assistance of counsel or either first or second foreign plaintiff. And so the jury confounded with these three different mental state terms and not given definitions, would have been likely to be confused, and that's especially the case where the prosecutor told the jury during closing arguments that child endangerment was the lesser offense. They would naturally assume that knowingly meant something different than willfully, because willfully is two different terms. And knowing that willfully, knowing that child endangerment was the lesser offense, they would believe that that was a lesser mental state. And that goes along with, if you look at the transcripts that I've attached to my opening brief, there's references the prosecutor has made to mental state being important in this case, and even to the idea that child endangerment requires a lesser mental state than the other two offenses. Now the issue, this instruction is extremely prejudicial here, because if you look at those transcripts again that I attached to my opening brief, you can see that the state was concerned about mental state in this case. The state believed that the reason for the verdicts was related to mental state. That was the reason that the state said that there were these acquittals. And the state then requested the voluntary manslaughter instruction because it was concerned about mental state. It was clear that mental state had become an issue. And so if you look at, also, the J&OB hearing, the judge advanced the idea that this was an eggshell skull case. And the state essentially agreed with that. The state had actually argued in closing arguments that this case involved an old injury on top of a new injury. So that would mean that there was a situation here where an act could be done that could cause, that could endanger the life, that wouldn't endanger the life of a normal person, but could have endangered the life of MR, Tavares' daughter in this case. So that tends to show that mental state would be an issue. And so it's noteworthy that in this case there was expert testimony. The defense expert, and first let me talk, I should mention that it's undisputed that within days prior to MR's death, she accidentally fell and hit her head on concrete twice. This came out in the state's evidence on direct examination of its own witnesses. It's undisputed that these falls occurred. Now one of the highly disputed issues was about whether those falls caused the death. The defense expert testified that the death was completely consistent with those falls and there was no evidence of inflicted trauma or child abuse whatsoever. The state's expert disagreed with that and said that the falls, accidental falls, could have caused subgluteal hemorrhaging, but the state's expert did not believe that that caused subdural hemorrhaging, which was testified to be the fatal injury here. So the issue of Tavares' actual instance in this case was highly contested and strongly supported by expert testimony and the trial judge even acknowledged that his defense expert made a strong presentation attacking the testimony of the state's expert. But even if it's assumed that there was some act here that Tavares did that had something to do with what happened, the actual skull situation really goes to the fact that he didn't have the majesty that was required. And there's also highly contested evidence of whether there's a pre-existing condition here. This was a situation where MR had been taken to the doctor just weeks before she died because she was hitting herself and biting herself and had a rash all over her body that looked like broken blood vessels. There were incidents of prior falls, which in addition to these other two that happened months before, and there's testimony that multiple falls could have created a situation that could have led to this as well. And to the extent that this court, Issue 2, is going to be dispositive, the jury instruction error issue is going to be dispositive, the interrogation video is very important. If your honors have not already seen that and you're going to be addressing Issue 2, I think it is essential that you watch the interrogation video. You can see the genuine expressions of shock, disbelief, and sadness of Tavares here. It is very apparent from the video that he did not intend to do anything that endangered his daughter's life here. And there are 12 character witnesses here who testified that he was a very kind and gentle person and that he wouldn't do anything to hurt a fly, was one of them. He had a teacher who testified that he was the most peaceful, gentle male student he had had in his 30 years of teaching. There's very strong evidence supporting the fact that he did not have the mental state. He did not intend to do anything that endangered his daughter's life. If you look at what's described in the interrogation video, and that was also something that Judge Pierce, the judge talked about the Reid Technique and said there should be greater scrutiny of the Reid Technique after this case because it was used on my client who was 17 years old at the time. He was told that evidence that was certain, showed with certainty that he did this. And at that point, he made some statements. The main statement that he made involved pushing his... It involved a situation where he was putting his daughter down for a nap and he said that he was on his knees. She was in this daybed that was on the floor. She was sitting up. She was about 3 feet, 3.5 inches tall, standing, sitting down. She was maybe a foot or two high at that point. And what he said is that he grabbed her by the arms and he pushed her back into the bed. It's a soft daybed that's on the ground. He did it a single time. He said that he did it forcefully and that he fully extended his arms. But the police officer in this case who heard that testified that he did not believe that that action could cause serious injury to someone. He didn't believe. The police officer himself did not believe that could cause it. Now, that's one of the reasons the officer went on and was trying to get him to say something about some impact against something else. He made some statements that she could have impacted her head against a plaque that was sitting on the floor. However, these statements were conditional, and they suggested that he did not know or anticipate that this could have happened. Additionally, a trial judge found that an impact on the plaque was not the cause of death at the hearing on the J&OB. So one called upon to decide on the rational trial fact standard at that point at the J&OB hearing, and the judge, if you look at the J&OB hearing, the judge seemed to contemplate potentially throwing this out on reasonable backgrounds at the J&OB hearing. Under that standard, he did not do so. However, the comments that he made suggested that this was... I'm sorry, I lost my train of thought. Well, let me interrupt you since you've lost your train of thought. Yes. On the issue of causation, we have experts doing experts, and when you throw in there the police officer that also seems to have weighed in on causation. With respect to knowledge or willfulness, was there any testimony indicating the defendant knew or was aware of the prior falls of the victim that the experts were divided as to whether the previous falls caused the death? I don't believe there's... Was he aware of those prior falls? I think the testimony was mother was with the child. Correct. I don't believe there was any evidence. It's been a long time since I've looked at the record in this case. It's my record, but from my recollection, I do not believe that there was any connection between him and these prior falls. It was the mother and another resident of the home, Echo, the mother, Kaylee and Echo, who testified about these prior falls, and I don't believe there was anything... The child did not receive medical attention for those falls resulting from tantrums? Yes. The falls, one of them resulted from the child throwing herself backward in a tantrum and hitting her head on concrete.  And from what I understand, that was in the days prior to her death, and I don't believe that there was medical attention that was sought at that point. So with respect to willingly or knowingly endangering the life of this child, the state's evidence failed to link knowledge of prior falls to defendant? That's correct. I think it did fail to link knowledge of the prior falls, and it's also noteworthy that none of the witnesses in this case believe that there's anything wrong. So it's clear that many people here didn't think that her life was necessarily endangered, and there was testimony by, I believe it was the defense expert, that this would not be something... Even a doctor, if they had taken the child to the doctor, might not know that this was a life-endangering situation. So it's a situation where that, in itself, the doctor may not have been able to determine that, and the other family members didn't have that issue. And also I'd note that this is not a case of... The jury instruction was about endangering the life again, so it's not a case of endangering the health. It was never the state's theory that that was an issue I'm talking about not taking the child to the doctor, so I don't think it would be appropriate in this case to really look at that, and especially, as we discussed, there's no connection. My question is about taking the child to the doctor related to the prior two falls so that knowledge could be imputed to the defendant. He was aware that the child had head trauma. Oh. But I understand why you diverted to the other issue, because I appreciate that discussion. Okay. Mr. Vero, I'd like to go back. At one point you said something about the child hurting herself when you were talking about going to the doctor for the rash. Yeah. What is that about? Okay. So she was hitting herself and biting herself, apparently. Hitting herself and biting herself. Correct. And so the family took her to the doctor because of what they observed there. And the pediatrician believed that it may have been a behavioral issue. But that was, among other things, that could have suggested a pre-existing condition. There's also evidence that she was anemic not long before her death, which is something that can exacerbate bleeding. And there are other testimony related to conditions. Oh, she had done this imperfecta and potentially some other things. And this child had been to the doctor many times. I believe it was, I can't remember the exact number. I think we're talking about she was 26 months old at the time that she died. I believe she'd been to the doctor about 19 times and to the ER three times or something like that. So there did seem to be signs of issues. And this defense expert believed that combined with the falls caused the death. The state's expert disagreed. Are there no further questions? Are there any other questions? Okay, thank you, Mr. Barrett. Thank you, Your Honor. Mr. Danilovic, good morning. May it please the Court, counsel. Good morning, Your Honor. I'll take the, my argument would be following the issues in the same pattern that the defense counsel raised here. The right to a public trial issue. I hate the phrase, but in this particular situation, the phrase, it is what it is, kind of fits this. The trial judge in this case, in the courtroom, which is for an older courthouse, a very large courtroom, nonetheless, his decision was that basically he didn't want the potential jurors to be contaminated by any kind of facial expressions, any kind of anything at all coming from members of the public. So what he did is he had what would be referred to as a limited closure in the sense of two people from the defendant's family and two people from the victim's family, and how he phrased it was there were people there on behalf of the defendant and there were people there who, if you will, opposed the defendant. That's how I believe the trial judge phrased it. And because of the fact that what we had here is we had the father on trial for the death of the child. So in essence, what we had is we had a situation where two members from the defendant's family, two members that were, if you will, on the side or pro-active with respect to the victim and the victim's death, could take and stay. Everyone else would have to leave during the wide year. I believe that the trial judge expressed this because he didn't want anybody obviously standing in the courtroom and what he didn't want is he didn't want people contaminating potential to contaminate the jury, so he was going to take the call. Let me ask you about that. I mean, if he's worried that people in the gallery, if you will, might contaminate the jurors or somehow their facial expressions might affect them, wouldn't it be better to know if you've got a juror that was going to be affected by something like that during the selection process than after? Because these people are coming back into the courtroom once the trial starts. So if you've got a juror that might be especially susceptible to any facial expressions or body language by people in the gallery, wouldn't the best time to find out about that be during a board hearing instead of after they're put on a jury? I honestly cannot dispute that with you, Your Honor. Your opinion differs from Judge Erickson's and he, for whatever reason, believed that it would be better to take and try to pick a jury this way. In addition to, I'm sure that part of it was also the fact that he wanted to take and have, I believe it was like 96 or whatever number of jurors, potential jurors there, to have them all in the courtroom, give them all the general admonishment at one time to help expedite the situation, to expedite jury selection, to take and move it along, to take and not foreclose it, not to take and trivialize it, but in an effort to simply take and move it along as expeditiously as possible to get to the trial. And I don't say that that's necessarily an overriding interest, but that's all that I can take and gather from what the trial judge said. Doesn't the case law suggest that that's the opposite kind of approach that the court should be taking, that it should err in terms of having people in the courtroom? I'd like to ask another question about the contamination thing, too. Isn't that a risk that is always posed when people are in the courtroom? That is true. That is true. Again, I cannot take and argue against reality, and that is the realistic aspect of the situation. There's a potential because a lot of times, I mean, you've heard judges warn when the jury comes back with his verdict, you know, for members of the gallery not to take and respond, et cetera. I mean, there's always, and you always have people sometimes crying out, crying, or somebody emotionally charged will say something during the middle of a trial. I can't take and argue against the reality of that, and I can't take and argue against the fact that in your mind, it might be something that would be better suited to find it up front. Obviously Judge Erickson didn't believe that, didn't think that way, and so he chose this limited closure because you have to take and understand, he also did indicate on the record the fact that the defendant had a right to public trial, and it was a public trial, and he tried to maintain that stature even through the limited closure. Well, in defense of Judge Erickson, I mean, he's a respected jurist. He has a lot of experience, and we can't really put ourselves in his position to evaluate the energy in the courtroom. Your brief mentions that this was a highly emotional situation for both sides of the family and the public, that the public was interested in this. However, if there were 91 jurors in the courtroom, can't they be considered part of the public? Well, of course they would be considered part of the public, but it's their status at that time. Their status is that they are potential jurors who are going to be chosen potentially to decide the fate of the defendant. But the courtroom had 91, I'm just picking that number out of the air, 91 citizens there with no interest, we hope, in the proceeding, and four members of the family. So your position, is your position, I don't know what your position is, not good enough, good enough? I think it is. I think what the state's position can only be is the fact that the trial judge accommodated the right to a public trial, didn't bar the public totally. And it was that limited, that partial, that type of closure, an effort designed to protect the defendant's right to a public trial, while at the same time trying to foster what Judge Erickson believed was required in the situation. Because of the highly emotional aspect of the case, he wanted to take and try to take and insulate potential jurors as much as possible. Did he make that finding on the record? Did he make that finding? I think he articulated that in so many words. I can't exactly tell you off the top of my head that I can quote him, but he did speak in terms of the nature of the case, and by saying that there are people for the defendant, and really some people for the victims and some people against the defendant, I think indicates the kind of atmosphere, indicates the emotional aspect of this case, what was going on, and how the people were, I believe, I don't know if it's on the record or not, but I believe that there were people there that were in t-shirts on behalf of the victim.  So, again, I wasn't there, obviously, neither were your honors, and we're objectively looking at this, and again, I cannot take and dispute reality, I cannot take and argue what was presented and what the trial judge tried to do. And obviously, if that ends up being something that this court believes, deprived the defendant of his right to a public trial, in all honesty and candor, that's what this court is going to find. And that is something that, on this record, I don't think justifies that finding, because of what he did. Unlike the cases that were cited, almost all of it, almost all of the cases that were cited by defendant support, in those cases, the trial judge completely excluded the entire public from a broad area. There was no limited closure or anything. And in the one case, it was proved that it was the trial judge's standing procedure. So that was, when the trial judge has a standing procedure that does something like that, that usually always ends up being bad for the trial judge, because it doesn't allow for discretion. We just have the standing rule, and if that rule violates the defendant's right, having that standing rule, there's no room for accommodation, then that is usually always going to take and be errored. That's not the situation in this case, which is why the people have been able to argue and do argue that in this case, the defendant really was not denying his right to a public trial by this limited closure. In addition, we also argued the fact of, I argue waiver as opposed to forfeiture, because, as the case law kind of provides in this case, defendant was present, defense counsel was present, no objection was made. And the procedure was followed, the procedure was done, and now it's raised for the first time on appeal. The court has said that in this particular situation, this kind of affirmative acquiescence transcends simply a procedural failure. It's more of a question of a stopper. And that in this particular type of situation, the failure to take and say anything when could have been said and easily eliminated and asserted the right, affirmative acquiescence on the part of the defendant, defense counsel in this case, operates as a waiver of the right to the public trial under these circumstances. And so that was also part and parcel of our argument with respect to this issue. With respect to the jury instruction issue, once again, as your Honor asked, this particular, the lack of giving a definition of the word willful as meaning the same thing as knowing, was likewise, or is likewise, forfeited, because defense counsel did not object, did not request, defense did not request this instruction. And so, as a result, technically it is forfeited, unless it falls under 451C, which means a substantial defect, which is basically the equivalent of plain error. In this case, with respect to the definition of willful, willful is the same as knowing. If the jury was instructed that willful means knowing, the verdict would not have changed. The point is, the jury followed the instruction, followed the issue's instruction, using the term willfully. In this particular case, the jury instruction, the issue said that, first of all, the defendant had to have the care and custody of the victim. Secondly, that the defendant willfully, slash knowingly, if it had been defined, caused or permitted the life of the victim to be in danger. The third is his act of approximate cause. Willfully caused or permitted the life of the victim to be in danger. That mental state, willfully, did he willfully act? Did he willfully choose to act? It's not a question here, with respect to willfully, with respect to the fact that he had a specific intent to harm the child. That was the murder instruction. That was the involuntary manslaughter instruction. It's not the instruction here. It's not a question of what he intended. It's a question of did he willfully act? Did he willfully cause the endangerment? And endanger is defined in Jordan as the potential or possibility of injury. Conduct that could or might result in harm. It doesn't look at what the harm is. It looks at the conduct and the potential. The prime example in Jordan. But Mr. Burrell is arguing that harm is death in this case. The harm is death. But that's not what the defendant was charged with. The defendant wasn't charged on an endangerment with, if you will, causing the death. What he did is he endangered the victim. He doesn't need to know the exact end result. What does he have to know for knowingly? Knowingly, he has to knowingly cause. He has to knowingly do something. What does he have to know? He has to take a note that basically by his act there is a potential for harm. And he has to know that at the time he does the act. Exactly. Much like if you take, for example, and I'm going to take it. The way this jury was instructed, potential for harm that resulted in causation of death. Correct? Causation of harm. He did something that caused the potential danger of causing, of endangering the life of the victim. And he had to know that he was doing that. He had to know that his act created the potential. What's the evidence that he knew? The evidence of what he knew is the fact of basically we are going to take, and I disagree with counsel's argument. We have to take a look. How do we always prove intent? We always prove intent by looking at the circumstances that occurred at the time and what the defendant did. Do we know that the defendant knowingly didn't act? Thank you. That he knew would endanger. Not that he knew that he would endanger. He didn't knowingly do an act. As the instruction said, he knowingly caused or permitted the life of the victim to be endangered. He doesn't have to know that by doing what he's doing, she's going to die or she's going to be injured. It's creating the atmosphere for danger. If you take a look at Jordan. What did the dad do in Jordan? He wanted to go to a college library or a bookstore to get a book or something. It's 20 degrees, 20 degrees and going to chill. He left his daughter bundled in a winter outfit in the car while he ran in for approximately, according to the record, he said four minutes. The record showed it was more like half an hour or so. It was cold. Did he knowingly or did he know the end result would be that she might freeze? It was his act that the court looked at. It was the potential that she would be harmed. He endangered her. The court even said besides the cold, she was in a public parking lot. The court basically indicated with the number of people out there that are criminals, that prey upon children, there was that potential danger as well. A reasonable person would know that all of those things would cause danger to a child. A reasonable person knows you don't leave a child in a car when it's whatever it is. Zero. Does a reasonable person know that if you push a child down on a bed, you're endangering them? If you take and push a child down, push a child down forcibly, even on a bed, yes. Does a reasonable person know that? Yes. I would say so. I would say to take a child whom you want to have take a nap in, slam them down on a bed, and even separate and apart from the potential of hitting their head. Because slamming up, there's always the potential that something more could possibly happen when you do that. But the point is slamming a child down, yes. I think that a reasonable person would take and say that that endangers the child. Do you have any children? I have three boys. Do you ever get angry and push? No. No, okay. I would suspect that you're not a usual parent. Whatever usual parent means, but... I just don't know that a parent would reasonably expect that if they push a child down on a bed, I mean, he's not flinging her against a wall, throwing her on a floor.  What you're saying is you're tying the specific intent to injury. No, I'm talking about knowing. No, I am too. I'm not talking about intent. I'm talking about knowing. Okay. Well, knowing is an intent. I'm sorry? Knowing is an intent. It's a mental state, okay? And I realize intent is something more specific. But with this, it's the mental state of acting. And during the act, okay, did he normally do the act? Basically, he made the choice to do that. He made the conscious decision to pick that child and take that child and slam her down. Okay, that act, knowing and doing that act, okay, basically caused or threatened the victim's life. And in trying to take and say that he has to know that by his act, this is what's going to happen, I don't think that that is what... I don't think that's what Jordan says. I don't think that's what the case law provides in this particular situation, in this engagement. To know that by that act, he's endangering the child. He has to take... Is that correct? That's what he has to know, that if I do this, I'm endangering my child. I just want to know what he has to know. He has to knowingly act. He has to knowingly... Why don't you answer my question? I'm trying to, but I have a conceptual difference because I don't think that you have... Because the way you are phrasing it, it's as though he has to know what the end result is. No, he has to know that he's putting the child in danger. That's right. And willfully, consciously doing that act, that basically shows what his reaction is afterward, that I pushed her too hard, that I was afraid that if I took her to the doctor because of the fact that the way she sounded, she said, if I did that, I'd be afraid of child abuse. This all indicates that he knew that there was something that he did that potentially hurt the child. When did he know that? Right after. Did he know it at the time he did it, or did he know it afterwards? Well, it would obviously be afterwards. How could he... Well, if he obviously knew it afterwards, did he obviously know it at the time he did it? I would have to take and say yes. Okay. Time is up. Thank you, Your Honor. Thank you. Mr. Barrow, any rebuttal? Just a few points, Your Honor. Okay, going to the police trial issue real quick. I just wanted to note that there was a mention by the state here about some T-shirts being worn. That was a pretrial hearing. It's my understanding of the record, and the judge told people at that time not to do that in the future and that they couldn't be done before the jurors. There was no indication that there were any problems with anyone doing that after that point. So that didn't happen in front of the juror, and the judge told people not to do that. So it's clear that that resolved that issue. The state's attempt to distinguish the cases that I've cited is about as good as attempting to say that, well, this case is called Radford, and that case is called Evans. Just distinguish it based on basically something that has no legal merit to it. The argument is that it didn't exclude all the members of the public. That's not required. It's just was there an exclusion of members of the public is all you need, and is the overriding interest test met? Here it was clearly not. And the state's waiver argument certainly would end the plain error rule entirely if it were to be accepted because it says argument waiver just based on lack of objection, where there was no affirmative act to accept what occurred. In terms of the mental state argument, it's important to note that Jordan was a case involving endangering the health of a child. Here, just as we did, Your Honor was asking what exactly needs to be proven. Here it needed to be proven that he was endangering the life of his daughter, and he just needs to know at the time. Anything that he knew afterwards is not relevant to his mental state at the time. And I'll just note briefly here that the state's interpretation of the child endangerment statute is extremely broad, and it seems like it could include many types of misconduct. I mean, you could have situations where we're talking about the statute says willfully cause or permit a child to be endangered. Well, does that occur if you let your child play tackle football without a coach, and just no penning and all that stuff? I mean, like, how many situations are there where a child could be in some general risk? I think the state's interpretation does not comport with what the statute requires. Even so, it's not really that Jordan reversed and granted a new trial because there isn't a trial there. So it didn't say that that question was up to the jury while leaving a child in a car that was freezing cold where he could see a breath in the car for a long period of time. It was something that's somewhere no endanger a child's health. If there are no additional questions, that's all I have. Thank you. Thank you, nurse. We thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will stand in brief recess for a panel exchange. All rise.